UNITED STATES *v.* J. E. BERNARD & Co., INC. (No. 4500) [1]

United States Court of Customs and Patent Appeals, March 30, 1946

*Paul P. Rao*, Assistant Attorney General (*Sybil Phillips*, special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellee.

[Oral argument February 7, 1946, by Miss Phillips and Mr. Schwartz]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The United States has here appealed from the judgment of the United States Customs Court, Third Division (C. D. 887), which sustained the importer's protest against the collector's classification of a work of art, a painting in oil, under paragraph 1547 (a) of the Tariff Act of 1930 and his assessment of duty thereon at 15 per centum ad valorem under said provision as modified by the trade agreement with the United Kingdom, T. D. 49753. The importer claimed the merchandise to be free of duty under paragraph 1807 of the Tariff Act of 1930.

The facts of the case are not in dispute. The oil painting is an original work of art by the well and favorably known painter, Alfred Pellan, and is called "Nature Morte au Chevalet." The testimony of Harold B. Seldon, examiner of merchandise at the port of Chicago, and Charles S. Downs, advertising manager for the Abbott Laboratories, the consignee of the imported merchandise, was taken before the trial court. Their testimony shows that the painting is an original oil painting and considered to be a work of art and was created solely for its aesthetic value but was imported for the sole purpose of being reproduced as a cover page on a magazine published by Abbott Laboratories, who are engaged in the manufacture of chemicals and medicinals and who advertise their products in said magazine. The magazine is sent to physicians.

The painting is in a number of bright colors, showing an easel and paint palette standing in front of a table upon which are a fruit bowl and a part of a tea set and several items of fruit, apparently mostly apples. Judging from its reproduction on the magazine, it is of pleasing and attractive appearance and clearly shows a rough and somewhat uneven oil paint characteristic.

Paragraphs 1547 and 1807 of the Tariff Act of 1930 read as follows:

PAR. 1547. (a) Works of art, including (1) paintings in oil or water colors, pastels, pen and ink drawings, and copies, replicas, or reproductions of any of the same, (2) statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50, and (3) etchings and engravings, all the foregoing, not specially provided for, 20 per centum ad valorem.

(b) Paintings in oil, mineral, water, or other colors, pastels, and drawings and sketches in pen and ink, pencil, or water color, any of the foregoing (whether or not works of art) suitable as designs for use in the manufacture of textiles, floor coverings, wall paper, or wall coverings, 20 per centum ad valorem.

PAR. 1807. Original paintings in oil, mineral, water, or other colors, pastels, original drawings and sketches in pen, ink, pencil, or water colors, artists' proof etchings unbound, and engravings and woodcuts unbound, original sculptures or statuary, including not more than two replicas or reproductions of the same; but the terms "sculpture" and "statuary" as used in this paragraph shall be understood to include professional productions of sculptors only, whether in round or in relief, in bronze, marble, stone, terra cotta, ivory, wood, or metal, or whether cut, carved, or otherwise wrought by hand from the solid block or mass of marble, stone or alabaster, or from metal, or cast in bronze or other metal or substance, or from wax or plaster, made as the professional productions of sculptors only; and the words "painting," "*drawing*," "*sketch*," "sculpture," and "statuary" as used in this paragraph shall not be understood to include any articles of utility *or for industrial use*, nor such as are made wholly or in part by stenciling or any other mechanical process; and the words "etchings," "engravings," and "woodcuts" as used in this paragraph shall be understood to include only such as are printed by hand from plates or blocks etched or engraved with hand tools and not such as are printed from plates or blocks etched or engraved by photochemical or other mechanical process. [Italicized words new in the 1930 act.]

Paragraph 1547 (a) in the trade agreement is identical with paragraph 1547 (a), *supra*, except that the rate of duty is reduced from 20 per centum ad valorem to 15 per centum ad valorem.

The sole question presented in this appeal is whether or not an original oil painting, produced abroad by an artist to appeal to the aesthetic sense and not for utilitarian or industrial purposes, is excluded from the free-list provision of paragraph 1807 on account of the limiting provision, "shall not be understood to include any articles of utility or for industrial use," by reason of the fact that it was concededly purchased and imported for the sole purpose of being reproduced and used as the front cover of a magazine as hereinbefore stated.

Paragraph 1704 of the Tariff Act of 1922, the predecessor of paragraph 1807 of the Tariff Act of 1930, was modified by Congress, in respects with which we are here concerned, by the addition of the words, "drawing" and "sketch," and the term, "or for industrial use." The particular limiting clause with which we are here concerned, in the 1922 act, read: "and the words 'painting' and 'sculpture' and 'statuary' as used in this paragraph shall not be understood to include any articles of utility."

The trial court by a majority, one judge dissenting, expressly reversed its former holding, involving the issue here presented, in

*American Colortype Co.* v. *United States*, 2 Cust. Ct. 132, C. D. 107, where it had held, under circumstances like those at bar, that the term "for industrial use" excluded from the free list a painting similar to that at bar.

The majority of the trial court in the instant case held that the painting had not been created or designed for industrial use or utilitarian use and that the mere fact that it had been imported for industrial use was not a controlling consideration, relying for supporting authority upon this court's decision in the case of *Progressive Fine Arts Co.* v. *United States*, 18 C. C. P. A. (Customs) 306, T. D. 44506, wherein this court held that the classification of a painting under the free-list provision of paragraph 1704 of the Tariff Act of 1922 was not barred by the term, "any articles of utility," and that the controlling fact to be determined was what the merchandise actually was at the time of importation and not its intended use when imported.

We are of the opinion that the trial court erred in its holding that the classification by the collector was erroneous.

Our decision in the *Progressive Fine Arts* case, *supra*, has no bearing upon the instant issue because the pertinent provisions of the Tariff Act of 1922 did not contain the stated limiting provision, "or for industrial use," found in paragraph 1807 of the 1930 act. There we held that the question as to whether or not a thing was an article of utility did not depend upon the intent of the importer, but we did not have before us the question as to whether or not the controverted words, "or for industrial use," in the later act operates to exclude from the free-list paragraph the painting at bar.

We think the trial court's decision in the *American Colortype Co.* case, *supra*, was sound and should have been followed by it in the instant case. It pointed out the legislative history of paragraph 1807, *supra*, which we think clearly shows that Congress, by the use of the said new language in paragraph 1807, intended to make the dutiable status of oil paintings such as the one at bar depend upon the purpose for which it was imported.

The importer urges that the Government's position, if accepted, would bring about an anomalous result insofar as two identical paintings might be imported at the same time and at the same port, bought by two persons though for wholly different purposes and one would be dutiable and the other one free.

As a general proposition, making the dutiable status of imported articles depend upon what use the importer, at the time of importation, intended for them after importation is concededly a policy which Congress, for reasons which are obvious, does not often follow. It has, however, in some instances, made exceptions to its ordinary

policy of making the dutiability of imported merchandise depend upon this consideration, and we think it has done so here.

For instance, in paragraph 1530 (c), the leather provision, it provided for various kinds of leather, tanned and treated in various manners, and then followed the listing of said leathers with the following language:

any of the foregoing *if imported to be used in the manufacture of boots, shoes, or footwear* * * * 10 per centum ad valorem. [Italics ours.]

By there making the intent of the importer the criterion in determining the dutiable status of the leather, leather which goes into the making of shoes pays a lower rate of duty than if manufactured into other articles and it was clearly intended to cheapen the price of shoes.

There are a number of instances where, under the Tariff Act of 1930, two different importers of the same product, at the same port, might be required to pay different rates of duty. The fact that it might be calculated to bring about administrative difficulties was apparently in the congressional mind, but Congress also knew that the Secretary of the Treasury was authorized to prescribe rules and regulations for carrying out such provisions, which rules and regulations, as far as we know, enabled the administrative officers to carry out the congressional purpose with reasonable certainty.

Paragraph 1541 (a), which provides that musical instruments, otherwise dutiable, would be free of duty if "designed and constructed for installation and use in a particular church * * * which are imported for that specific use and which are so installed and used," is another illustration of the departure by Congress from its ordinary practice.

A comparable situation is found in paragraph 1810 of the Tariff Act of 1930, which might involve some of the same works of art as are provided for in paragraph 1807 which we have here under consideration. There the free of duty status of certain works of art depends upon whether or not at the time of importation they were imported to be presented to certain institutions.

It is also interesting to note that in a number of other free-list paragraphs, provisions are made which are exceptions to the rule that merchandise is ordinarily dutiable in the condition as imported. See paragraphs 1607, 1628, 1631, 1682, 1767, 1773, and 1774.

In view of the context of the provision and the legislative history connected therewith, if the controverted language is not given the interpretation and effect for which the Government here contends, we are at a loss to know what other reasonable meaning can be given to the term. The language itself, particularly when considered in the light of other similar provisions in the tariff act, would seem to preclude any other interpretation. The meaning of the words "for"

and "industrial" is certainly not obscure. Webster's New International Dictionary defines "for" as follows:

**2.** Indicating the end with reference to which anything is, acts, serves, or is done; as: a. As a preparation for; with the object of; in order to be, become, or act as; conducive to. * * *
**d.** Intending, or in order, to go to or in the direction of.

and "industrial" as meaning:

**1.** Relating to industry or labor as an economic factor, or to a branch or the branches of industry; of the nature of, or constituting, an industry or industries * * *

"For" clearly indicates that if the merchandise is imported "for" use in industry it cannot be admitted free of duty. This result necessarily follows although it may not be utilitarian *per se*.

There can be little doubt that reproducing an oil painting on the cover of a magazine such as the one at bar, the purpose of which is to advertise well-known articles of commerce, is an industrial use rather than the ordinary use of a work of art, which is to so use it as to impart pleasure from its aesthetic qualities.

Whether or not there are circumstances, differing from those at bar, where paintings, drawings, or sketches or other articles named in the paragraph might be imported with the intent of making some use of them in certain kinds of publications and be free of duty presents a question not here involved and is in a field which we do not choose to explore on the present record.

It might be suggested that the pleasing appearance of the instant painting, when reproduced on the front page of a magazine or inside the magazine, is similar to that imparted when the painting adorns a wall, but we must not overlook the fact that its intended purpose was to give a pleasing appearance to an article used by an industry to promote its industrial or commercial advancement. Some of the most attractive commercial advertisements and articles are greatly enhanced in value and appearance by the artistic touch. However, this issue need not be belabored here since there is little, if any, serious contention on the part of the parties hereto that the use for which the instant painting was imported was not an industrial one.

We think the legislative history connected with paragraph 1807, *supra*, shows clearly that Congress did not use the term "articles of utility" and the term "or for industrial use" in a synonymous sense. As was pointed out by the United States Customs Court in *American Colortype Co.* v. *United States, supra*, at page 134,

If the words "for industrial use" mean no more than the words "articles of utility," there could be no reason for inserting the additional words "for industrial use" in the paragraph. Therefore, it must be held that the new language "for industrial use" was intended to have a different meaning from the words "articles of utility."

On page 66 of "Memorandum of Court Decisions Affecting the Tariff Act of 1922," prepared for the use of the Committee on Ways and Means of the House in connection with H. R. 2667, which later became the Tariff Act of 1930, appears the following:

PAR. 1704. In *Cheney Bros.* v. *United States*, Abst. 49369, 47 Treas. Dec. 1064, the court held that certain original designs in water colors imported to be transferred to a press by means of an etching or engraving and printed on silk, and used for industrial purposes, were free of duty under paragraph 1704, and not dutiable as paintings under paragraph 1449, as classified by the collector of customs.

If the provision was not intended to cover *paintings* or designs for industrial uses, it should be amended. It is believed the following provision, as amended, would meet the situation:

PAR. 1704. * * * and the words "painting," "*drawings*," "*sketches*" *and* "sculpture" and "statuary" as used in this paragraph shall not be understood to include any articles of utility, *or articles for industrial use*, nor such as are made wholly or in part by stenciling or any other mechanical process. * * * [Italics copied, except *paintings*.]

The nature of the *Cheney Bros.* case is stated in the quotation and it will be observed that Congress was told that certain original designs in water colors imported to be transferred to a press by means of an etching or engraving and printed on silk were for industrial use and that the Customs Court had held the same to be free of duty under paragraph 1704 rather than dutiable as a painting such as was provided for under paragraph 1449.

It may be true that this holding, prompted probably by representations by certain American artists, was the cause of the addition of the words "drawing" and "sketch." But just why it thought it was necessary to add "or for industrial use" can only be explained, as we see it, upon the theory that it was thought proper to say that paintings, drawings, sketches, sculpture, and statuary, even though they were not articles of utility, would bear a customs duty if imported for the purpose of being put to an industrial use. This action on the part of Congress is in entire harmony with its oft-declared purpose to encourage the study and development of the free fine arts by free listing artistic articles falling within this special category.

The importer contends that the purpose of the new language was to overcome the holding in the *Cheney Bros.* case and that the only purpose that Congress had in mind in making the change was to see to it that original drawings and sketches, "if *created* for utilitarian or industrial purposes," (italics ours) be made dutiable.

If Congress had in mind only what appellee suggests and only wanted to see to it that sketches and drawings which were *created* for utilitarian purposes were made dutiable it only had to add the two words, "drawing" and "sketch," as has been suggested and stop at that. But it went further and it made apply to all five words the

new language, "or for industrial use," thus, in our judgment, clearly indicating that it meant to exclude from the paragraph not only articles of utility *per se* but also articles not of that character which were imported to be industrially used.

Both parties hereto have discussed that portion of the legislative history of the provision which includes parts of the Conference Committee Report No. 1326, dated April 28, 1930, explaining the nature of certain amendments, where the following statement is contained (p. 103):

Senate amendment No. 1100 includes within the operation of this limitation the terms "drawing" and "sketch", and amendment No. 1101 *further* excludes from the paragraph such articles for industrial use; and the House recedes on both amendments. . [Italics ours.]

The importer urges that there is nothing in said conference report that shows any intention to exclude from the paragraph articles not *"created* for utilitarian or industrial purposes" (emphasis not supplied), and the Government urges that it definitely supports its position. While the report could have been made more specific and therefore more helpful, we think it has the tendency of supporting the Government's contention and our position above stated.

For the foregoing reasons it is concluded that the trial court fell into error in not sustaining the classification of the collector and in not overruling appellee's protest, and its judgment is accordingly *reversed.*

GARRETT, P. J., dissenting:

I respectfully dissent. The painting here at issue, concededly a work of art, was not created by the artist to be reproduced and used on the cover page of any sort of publication but solely as a work of art. It was not made for, or upon the order of, Abbott Laboratories. The agent of Abbott Laboratories seems to have seen it for the first time on display in a studio in Montreal, Canada.

In the *Cheney Bros.* case (47 Treas. Dec. 1064), cited in the majority opinion in its discussion of the legislative history, the designs in water colors there involved seem to have been created for the purpose of being reproduced as etchings and engravings to be printed on silk and used for industrial purposes. Notwithstanding this, the Customs Court held them entitled to free entry under paragraph 1704 of the Tariff Act of 1922, which is in part predecessor of paragraph 1547 of the Tariff Act of 1930.

I am of opinion that paragraph 1547 of the Tariff Act of 1930 was formulated to meet the decision in the *Cheney Bros.* case, *supra;* that it was intended to make dutiable paintings, sketches, drawings, etc., which were created, or executed, for industrial use, and that it was not intended to make dutiable actual works of art not created for industrial use.

I do not regard the situation with respect to the leather paragraph and the musical-instruments paragraph as being analogous to the situation here.

I may add that whether the use made of the painting here involved was an industrial use is, in my opinion, at least questionable, but no useful purpose would be served by elaborating upon it in a dissenting opinion.